**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

EXPERI-METAL, INC.,
a Michigan corporation,

        Plaintiff,                  Case No. 2:09-CV-14890

v.                                       Hon. Patrick J. Duggan
                                             Magistrate Judge Paul J. Komives

COMERICA BANK,
a foreign banking organization,

        Defendant.

---

| | |
|---|---|
| Richard B. Tomlinson (P27604) | Todd A. Holleman (P57699) |
| Daniel R. Boynton (P30359) | Lara Lenzotti Kapalla (P67667) |
| Joseph W. Thomas (P33226) | Boyd White III (P72398) |
| DRIGGERS, SCHULTZ & HERBST, P.C. | MILLER CANFIELD PADDOCK AND STONE, PLC |
| Attorneys for Plaintiff | Attorneys for Defendant Comerica Bank and Non-party Daniel McCarty |
| 2600 West Big Beaver Road, Suite 550 | 150 W. Jefferson, Suite 2500 |
| Troy, MI 48084 | Detroit, MI  48226 |
| (248) 649-6000 | (313) 963-7420 |
| rtomlinson@driggersschultz.com | holleman@millercanfield.com |
| | kapalla@millercanfield.com |

---

**COMERICA BANK'S TRIAL BRIEF**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

APPLICABLE LAW AND ARGUMENT .......................................................................... 4

    I.     THE RELEVANT TRANSFERS IN THIS CASE ARE THE WIRE
          TRANSFERS THAT LEFT COMERICA ........................................................... 4

    II.    COMERICA ACCEPTED EXPERI-METAL'S WIRES IN GOOD
          FAITH ................................................................................................................. 5

    III.   EXPERI-METAL DID NOT PROVIDE COMERICA WITH ANY
          WRITTEN INSTRUCTIONS LIMITING THE TRANSFERS ........................... 7

CONCLUSION .................................................................................................................... 7

## INTRODUCTION

This case arose because Plaintiff Experi-Metal gave its online banking login ID, PIN, password and account information away to criminals in response to an internet "phishing" scam.[1] The criminals then used that information to access Experi-Metal's accounts at Comerica Bank and transfer approximately $1.9 million out of them.  When Comerica learned of the fraud, it responded with a team of employees who shut down the transfers and recovered all but approximately $560,000 for Experi-Metal.

Experi-Metal has admitted the transfers never would have occurred if its employee had not given away his security credentials.  But notwithstanding this fact, Experi-Metal filed this lawsuit claiming that Comerica should pay for all of its losses.  Experi-Metal's claim fails under MCL § 440.4702.  That statute states that the wire transfers made with Experi-Metal's online credentials are Experi-Metal's responsibility when those transfers were authenticated using a commercially reasonable security procedure, and accepted by the bank in good faith and in compliance with any written agreement of the customer restricting acceptance of the payment order.

This Court has already determined that Comerica's security procedure was commercially reasonable as a matter of law.  The only issues left for trial are whether Comerica accepted the wire transfers in good faith and in compliance with any written instructions from Experi-Metal that would have limited Comerica's acceptance of those transfers.  The evidence will show that

---

[1] Phishing is the "act of sending e-mail that purports to be from a reputable source, such as the recipient's bank or credit card provider, and that seeks to acquire personal or financial information. The name derives from the idea of 'fishing' for information." Encyclopedia Brittanica, http://www.britannica.com/EBchecked/topic/1017431/phishing

"In phishing, typically a fraudulent e-mail message is used to direct a potential victim to a World Wide Web site that mimics the appearance of a familiar bank or e-commerce site. The person is then asked to 'update' or 'confirm' their accounts, thereby unwittingly disclosing confidential information such as their Social Security number or a credit-card number." *Id.*

Comerica acted honestly and fairly when it accepted the wire transfers. The evidence will also show that Experi-Metal did not give Comerica any written instructions limiting its acceptance of the wires. As such, Experi-Metal is responsible for the loss and cannot shift the blame for its carelessness to Comerica.

## STATEMENT OF FACTS

In approximately 2000, Experi-Metal began banking with Comerica Bank. Throughout its nearly 10 year relationship with Comerica, Experi-Metal used a number of different services offered by different divisions of the Bank. Each required their own separate agreement.

In late 2003, Experi-Metal decided that it wanted the convenience of being able to access its accounts remotely. On November 21, 2003, Experi-Metal's President, Valiena Allison, signed an agreement with Comerica's Treasury Management division to use its NetVision service for internet banking. When Experi-Metal signed up for this service, it specifically selected that it wanted the ability to send online wire transfers through NetVision.

As a requirement for using the NetVision service, Experi-Metal had to designate an Administrator for the account and specify who the other authorized users of the account would be. Comerica set these users up on NetVision, and the account Administrator was then able to log in and, without any involvement from Comerica, designate what actions each user could take on the company's behalf. Experi-Metal designated Valiena Allison as its Administrator. It designated Ms. Allison and Keith Maslowski (its Controller) as the authorized users of its NetVision account, and also as the persons authorized to initiate online wire transfers through NetVision.

As this Court has already determined, Comerica provided Experi-Metal with a commercially reasonable security procedure for authenticating such transfers. Experi-Metal agreed that transactions would be authenticated once Mr. Maslowski's or Ms. Allison's

credentials were used to log into the system, and that Comerica could then automatically process any wire transfers made without inquiring into the circumstances of those wires. Though Experi-Metal was given the option of requiring that each wire be confirmed by a second individual other than the one who initiated the wire, Experi-Metal did not decide to use this option. As a result, either Ms. Allison or Mr. Maslowski could send a wire unilaterally, without any further oversight from persons within their company, or from Comerica. When the name of the NetVision system later changed to TM Connect Web, this remained true.

In 2008, Comerica Bank became aware of a "phishing" scam, in which third persons were impersonating Comerica and other banks, and sending emails to customers asking them to register their security information by clicking on a link, which would then redirect them to a bogus internet site. On April 28, 2008, Comerica Bank sent an email to Experi-Metal and its other customers warning them about the fraudulent emails. Comerica Bank gave Experi-Metal explicit warnings not to click any link within the email, and that it would never initiate an unsolicited email asking customers for their confidential information, such as IDs and passwords. This email reiterated warnings on the TM Connect Web website, in Comerica's online banking user guides, and warnings and protections that had been well known to the public in general for years.

On January 22, 2009, Keith Maslowski received a phishing email. Ignoring Comerica's warnings that it would "never" email users to ask for their IDs and passwords and that customers should delete the emails without clicking on any links within them, Maslowski clicked on the link and gave Experi-Metal's customer ID and password, and his user ID, PIN, password, and secure token code to an unknown third party. After he did so, the unknown third party used that information to access Experi-Metal's accounts and make numerous wire transfers out of them.

Per its agreements with Comerica, these transfers were automatically processed by the computer system.

At approximately 11:30, Comerica became aware of several problematic wires that had been sent from Experi-Metal's account. Comerica promptly contacted Experi-Metal to determine whether or not the wires were fraudulent. Upon learning that Experi-Metal had not sent any wire transfers that day, Comerica immediately began contacting the departments involved in stopping further transfers. Within approximately twenty minutes, Comerica had put a hold on further wires coming from Experi-Metal's account and had begun to recover what funds it could. Through human error, Comerica accepted one wire after the hold was in place, and tried unsuccessfully to recover that wire. But while Experi-Metal's credentials were used to authorize $1,901,269 in wire transfers, Comerica was able to recover all but $560,000 for Experi-Metal.

## APPLICABLE LAW AND ARGUMENT

### I. THE RELEVANT TRANSFERS IN THIS CASE ARE THE WIRE TRANSFERS THAT LEFT COMERICA

Under MICH. COMP. LAWS § 440.4603(2), Experi-Metal is responsible for the losses Mr. Maslowski caused when he gave away his security credentials, provided Comerica "accepted the payment order" in good faith and in compliance with any written instructions of the customer that would restrict acceptance of the payment order. MICH. COMP. LAWS § 440.4702(2)(ii). Under this statute, each payment order is to be viewed individually.

"Payment order" is defined in relevant part as "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary." MICH. COMP. LAWS § 440.4603(1)(a). As such, payment orders do not include transfers between the customer's own accounts, but are

4

instead transfers of money from the customer's account to the account of another.

Further, the only payment orders relevant under MICH. COMP. LAWS § 440.4603(2) are those that were "accepted" by the bank, meaning those that actually left the bank. *See* MICH. COMP. LAWS §§ 440.4605(2); 440.4709(1) ("[A] receiving bank other than the beneficiary's bank accepts a payment order when it executes the order."); MICH. COMP. LAWS §§ 440.4605(2); 440.4801(1) ("A payment order is 'executed' by the receiving bank when it issues a payment order intended to carry out the payment order received by the bank.")

## II.     COMERICA ACCEPTED EXPERI-METAL'S WIRES IN GOOD FAITH

For purposes of both UCC Articles 3 and 4, "good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing." MICH. COMP. LAWS § 440.4605(1)(f); MICH. COMP. LAWS § 440.3103(1)(d).

> Although fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. *Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction.*

MICH. COMP. LAWS § 440.3103(1)(d), cmt 4 (emphasis added).

As such, determining whether a bank acted in good faith does not involve a negligence or ordinary care standard. *See Walter Thompson, USA Inc. v. First Bank Americano,* 518 F.3d 128, 137, 139 (2d Cir. 2008) (good faith is not a negligence standard); *Auto-Owners Insurance Company v. Bank One*, 852 N.E.2d 604, 611-12 (Ind. Ct. App. 2006), *vacated on other grounds,* 879 N.E.2d 1086 (Ind. 2008) ("a bank's failure to follow commercially reasonable banking procedures or to comply with its own policies generally will not constitute a lack of good faith."); *State Bank of the Lakes v. Kansas Banker Surety Co.*, 328 D.3d 906, 909 (7th Cir. 1997)("Avoidance of advantage-taking, which this section is getting at, differs from due care").

5

Instead, whether a bank acted in good faith hinges upon the bank's motives when it accepted the wire transfer. *See id; see also FDIC v. Rayman*, 117 F.3d 994, 1000 (7th Cir. 1997) ("'Good faith' is a compact reference not to take opportunistic advantage"); *Continental Cas. Co. v. Fifth/Third Bank* 418 F.Supp.2d 964 (N.D. Ohio 2006) (although bank accepted deposit checks for large sums over a protracted period of time, court concluded it accepted them in good faith because there was no evidence indicating that the bank's behavior resulted from a deliberate decision to ignore obvious fraud); Black's Law Dictionary (6th Ed.) at 595-96 (defining "fair" as "Having the qualities of impartiality and honesty; free from prejudice, favoritism and self interest.  Just; equitable; even-handed, equal, as between conflicting interests.")

The evidence in this case will show that Comerica did not act dishonestly or unfairly towards Experi-Metal.  As is common in the industry, and as was consistent with Experi-Metal's agreements with Comerica, Comerica's computer system automatically processed the wire transfers after it had authenticated them.  Therefore, no Comerica employee formed any subjective intent to process the wire transfers that left Experi-Metal's account on the morning of January 22, 2009.

Further, Comerica was the party that alerted Experi-Metal to the potential fraud.  After Experi-Metal confirmed that it was not placing the wire transfers, Comerica immediately began contacting the departments needed to stop the transfers, and within approximately 20 minutes had shut down the automatic acceptance of these transfers.  Comerica is entitled to a reasonable opportunity to act in response to customer's instruction.  *See* M.C.L. § 4702(2).  Due to human error, Comerica accidentally accepted one wire after this point.  However, the mistake was simply that, and was not done deliberately or maliciously.

6

### III. EXPERI-METAL DID NOT PROVIDE COMERICA WITH ANY WRITTEN INSTRUCTIONS LIMITING THE TRANSFERS

As Comerica acted in good faith, under MICH. COMP. LAWS § 440.4702, Experi-Metal is responsible for the losses Mr. Maslowski caused unless Experi-Metal provided Comerica with any written instructions that would have restricted Comerica's acceptance of the wires. No such instructions were given to Comerica.

Experi-Metal claims that the fraudsters were able to create overdrafts in its accounts by transferring money out of accounts with insufficient balances. However, the evidence will show that Comerica was specifically authorized to accept such transactions in its agreements with Experi-Metal, and that it had historically covered Experi-Metal's overdrafts at Valiena Allison's request.

Experi-Metal also claims that it restricted Comerica's acceptance of wires initiated using Mr. Maslowski's credentials. However, the evidence will show that, after designating Keith Maslowski as someone authorized to initiate online wire transfers for the company, Experi-Metal never revoked that authorization.

### CONCLUSION

For the foregoing reasons, Comerica respectfully requests this Court to enter judgment in favor of Comerica.

                Respectfully submitted,

                MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
                Todd A. Holleman (P57699)
                Lara Lenzotti Kapalla (P67667)
                Boyd White III (P72398)

                By:    s/Todd A. Holleman
                Attorneys for Defendant Comerica, Inc.
                150 West Jefferson, Suite 2500
                Detroit, MI 48226
Dated: January 19, 2011       (313) 963-6420 / holleman@millercanfield.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2011, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system and the Court will send notification of such filing to the parties.

Richard B. Tomlinson - rtomlinson@driggersschultz.com

                                        s/Todd A. Holleman
                                        Miller, Canfield, Paddock and Stone, PLC
                                        150 West Jefferson, Suite 2500
                                        Detroit, MI  48226
                                        (313) 963-6420
                                        holleman@millercanfield.com

18,735,019.1\022754-01932