UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EXPERI-METAL INC.,
a Michigan corporation,

       Plaintiff,

vs.                               Case No. 2:09-cv-14890
                                    Hon. Patrick J. Duggan

COMERICA BANK,

       Defendant.

_____

| | |
|---|---|
| Richard B. Tomlinson (P27604) | Todd A. Holleman (P57699) |
| Daniel R. Boynton (P 30359) | Lara Lenzotti Kapalla (P67667) |
| Joseph W. Thomas (P33226) | MILLER, CANFIELD PADDOCK AND |
| DRIGGERS, SCHULTZ & HERBST, P.C. | STONE, PLC |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 2600 West Big Beaver Road, Suite 550 | 150 W. Jefferson, Suite 2500 |
| Troy, MI 48084 | Detroit, MI 48226 |
| Telephone: 248.649.6000 | Telephone: 313.963.6420 |
| Facsimile: 248.649.6442 | holleman@millercanfield.com |
| rtomlinson@driggersschultz.com | kapalla@millercanfield.com |

_____

**TRIAL BRIEF**

## I.    STATEMENT OF FACTS

Experi-Metal began banking with Comerica Bank in approximately September, 2000, when Claudia Cassa banker at Huntington Bank advised Experi-Metal that she was leaving Huntington Bank and that she was going to Comerica, would be a Vice President. Experi-Metal decided to move their banking relationship from Huntington to Comerica as a result of the relationship it had with Claudia Cassa.

Shortly after Experi-Metal got to Comerica, Cassa began touting the advantages of on-line or Internet banking services to Ms. Allison.  Cassa and sales and marketing representatives, possibly Karen Keller, met with Ms. Allison and touted the advantages of on line banking to Ms. Allison. Initially the online banking was through a system called Gateway.  Subsequently  Casa touted the advantages of switching the online banking service to the new NetVision software.

Cassa touted Comerica's expertise in being able to provide excellent security protection in connection with Net Vision.  Ms. Allison looked at Cassa and Brenda Page as experts with respect to the security methods and procedures that they described to her.  Ms. Allison followed their leads and recommendations with respect to on line banking.  In November of 2003, both Cassa and Brenda Page talked to Ms. Allison about on line banking and software that was called NetVision Wire Transfer Service as part of the Internet or on line banking services that were available to Experi-Metal.   Cassa told Ms. Allison that she needed to sign a written agreement with Comerica in order to have the capability of sending electronic wire transfers by the Internet, using NetVision.

Cassa told Ms. Allison that Comerica was using a security process known as "Digital Certificates" as security for the NetVision Wire Transfer Service and to prevent unauthorized access to and withdrawals from Experi-metal's accounts.   Cassa explained that if Experi-metal signed up for the wire transfer service, a Digital Certificate would be loaded on a particular computer or computers at Experi-Metal and that NetVision could only be accessed from a computer on which the Digital Certificates were loaded.   Cassa explained that as a result, wire transfers could only be sent from Experi-Metal's computers on which the Digital Certificates had been installed and that it was a very secure system.  Based on her assurance, Experi-metal agreed

to sign up for the NetVision Wire Transfer Service, which would allow Experi-Metal to make wire transfers electronically.

At some point, Ms. Allison discovered that Keith Maslowski was authorized to initiate wire transfers.  In late October of 2007, Ms. Allison contacted  Cassa and told her that Mr. Maslowski should not be authorized to initiate any wire transfers.  Ms. Allison was to be the only one authorized to initiate wire transfers.  At that time, Mr. Maslowski was not an owner of the Company and Ms. Allison had decided only an owner would be authorized to initiate wire transfers.  Ms. Allison asked Cassa to prepare all of the documents necessary to accomplish that. Ms. Allison explained she still wanted Maslowski to have access to the Experi-metal banking information on-line; she just didn't want him to be able to initiate wire transfers, either on-line or by telephone.  Cassa told Experi-metal she would get Ms. Allison all the necessary paperwork to change the authorizations.  Ms. Allison signed the agreement on November 1, 2007 and returned it to Comerica and received a signed agreement back from Cassa.  The agreement designated Ms. Allison as the individual authorized to initiate wire transfers on behalf of Experi-metal.

Cassa told Ms. Allison at that point that she was the only authorized initiator for wire transfers, both by phone, or electronically.  Shortly after Ms. Allison signed the document, Cassa contacted told Ms. Allison that there should probably be more than one person authorized to initiate wire transfers.  She told Ms. Allison that it made sense from a business standpoint as there may be times when Ms. Allison was out of the country and might not be able to initiate a wire transfer and Experi-metal might need to make one.  Ms. Allison suggested that the second initiator could be Gerald King, who is a part-owner of the Company and Vice President.  Cassa said she would prepare and send out agreements to provide that there would be two authorized initiators for wire transfers, Ms. Allison and Gerald King.  Ms. Allison signed the agreement and

confirmed with Cassa that Maslowski was no longer an authorized initiator for wire transfers and only Gerald King and Ms. Allison could initiate any type of wire transfers, electronic or otherwise and no other actions were required to change it.

Experi-Metal used NetVision until approximately May of 2008. From the time Experi-metal started using NetVision through 2008, Comerica regularly sent Experi-Metal emails requiring Experi-Metal to click on a link specified in the email and once linked on the website specified in the email, to log in confidential banking information in order to renew the Digital Certificates. The renewal duty was assigned to Keith Maslowski and he took care of renewing the Digital Certificates. Ms. Allison also received emails reminding Experi-Metal to renew the Certificate.

Experi-Metal rarely sent wire transfers, whether they were initiated by phone, electronically or otherwise. Ms. Allison is aware that during the year 2007, Experi-Metal sent only two outgoing wire transfers, one in May of 2007 and one in June of 2007. Ms. Allison thinks that one of those wire transfers was sent electronically and one was sent through  Cassa's office. For the rest of 2007 and through all of 2008, Experi-Metal didn't send any outgoing wire transfers, either by phone, electronically or otherwise.

On April 25, 2008 Comerica sent a letter Ms. Allison describing the change to TMConnect Web. When she got the letter, she contacted Cassa to discuss the change to the TMConnect Web Wire Transfer System described in the letter. Cassa told her that beginning in May of 2008; the electronic wire transfer service available at Comerica would be through a system called TMConnect Web, rather than the NetVision Wire Transfer Services that Experi-Metal had been using prior to May of 2008. Cassa told her that the security technology was being enhanced to add Secure Tokens which was a type of security which would provide more

4

security for the customer's accounts.  Cassa also told her that under the new system, Maslowski would continue to have access to the on-line banking software and would be a "user" but he would not be authorized to initiate wire transfers.  At the time of the change to the TMC Web and the Secured Token technology was put into effect by Comerica, Ms. Allison was not given any other options or alternatives to the Secured Token technology, and never signed any type of agreement for TMC Web Wire Transfer Service and was not provided any booklets on service. Ms. Allison was never told by Cassa or anyone else that under the TMC Web Wire Transfer Service Experi-Metal could have accounts set up to require approval from more than one person for each wire transfer, or wire transfers based on a certain dollar amount, nor advised of any additional security features that could be used to protect Experi-Metal.

The TMConnect Web went on-line in May of 2008.  After Comerica instituted the wire transfer service through TMConnect Web, Experi-Metal never sent any wire transfers.  Experi-Metal received wire transfers after May of 2008 but those wire transfer were not received through the TMConnect Web software.

Keith Maslowski is the Controller at Experi-Metal.  He's been with the Company about 12 years.  Ms. Allison was the one who hired Maslowski.  He has reported to her.  His duties and responsibilities are to provide financial reporting and internal job cost reporting to Ms. Allison to allow her to make managerial decisions regarding the Company.  Maslowski does not and has never been authorized to sign checks from the Company's bank accounts on behalf of the Company; he has no check signing privileges and never has – only owners.  Keith was authorized to initiate electronic transfers between the various Experi-Metal bank accounts – moving money between accounts.  These are book transfers between Experi-metal corporate accounts in order to move money from one corporate account to another.  Prior to November 1,

5

2007, Maslowski was authorized to initiate wire transfers on behalf of the Company and that authority was taken away in November of 2007.  He has had no authority to initiate wire transfers or electronic wire transfers since November 1, 2007.  He is also authorized to do electronic transfers to vendors, which are called ACH transactions or "automated clearing house" transfers – not wire transfers.

On January 22, 2009 at about 10:50 a.m. Ms. Allison received a phone call from Denise Ling, who identified herself as working at Treasury Management, asking if the Company had initiated any wire transfers, any book transfers or any ACH transfers.  Ms. Allison told her that Experi-metal had not initiated any wires and Ms. Allison asked Keith Maslowski if he had done any ACH transfers or book transfers that day and he said no.  Ms. Allison advised Denise Ling that Experi-metal had not made any ACH or book transfers either.  Ling said there was a lot of wire activity with Experi-metal accounts and Ms. Allison told her that she should cease all electronic activity immediately.

At some point Keith Maslowski told Valiena Allison that he had received what looked like the normal kind of email from Comerica that Experi-metal received each year in connection with renewing the Digital Certificates stating that there was scheduled maintenance with Comerica's software and that Experi-metal should go to a web site directed in the email.  This was not an unusual occurrence as every year Experi-metal received the same kind of email from Comerica in connection with the renewal of the Digital Certificates.  These prior emails caused Maslowski to respond to the email that Experi-metal received on January 22, 2009.  After clicking on the link specified in the email Experi-metal was linked to a website which appeared to be a Comerica website.  Once on the "Comerica" website, Maslowski was required to log in and enter Experi-Metal's and his confidential customer ID number and confidential banking

information as he had in the past.  After providing that information, unknown and unauthorized third parties obtained the information, logged into Comerica's online banking site, and began using the TMC Web wire transfer service to initiate wire transfers out of Experi-Metal's sweep bank account, sending the funds to various accounts in Russia, Scotland, Finland and China, as well as domestic accounts.  In fact, between 7:30 a.m. and 10:50 a.m., 47 unauthorized and fraudulent wire transfers were made from Experi-Metal's bank accounts

Later in the day Kathy Davis from Comerica Fraud called Ms. Allison and explained that there had been an extremely high number of wires and she wanted to know why it happened. Kathy Davis explained that more than $5 million had been wire transferred out of an Experi-metal account.  Ms. Allison asked how that could be true as Experi-metal did not have $5 million dollars in the account and our written agreements with Comerica limited the amount of wire transfers to the amounts we had in the account.  Ms. Allison talked with  Cassa about the same thing.  Cassa told Ms. Allison she had no idea but that she would look into it.

Denise Ling and  Cassa both said let Comerica Fraud handle it.  Within a few days  Cassa called Ms. Allison and told her that the fraudsters had made all sorts of transfers from the employee savings account into the sweep account, fictitiously creating balances.  She explained that the fraudsters had done millions of dollars of book transfers from the employee savings account into the sweep account and that's what had caused the accounts to be overdrawn by $5 million.  Ms. Allison asked her to explain how that could have happened, since the employee savings account was a zero balance account and there was no balance or money in the account to do a book transfer.

Cassa had no idea why the fraudsters would be able to make book transfers on an account with insufficient funds to cover the transfer.   Cassa said that Fraud was investigating it

and finding out how and why it happened with insufficient funds.   Cassa never provided any explanation for it; in fact, told Ms. Allison she was not allowed to speak with her any longer at some point in time.

Later in the day on January 22, 2009, Ms. Allison spoke with  Cassa concerning   checks for $78,914.20 that Experi-Metal had received on January 22.  Ms. Allison asked Denise Ling if it would be safe to deposit the checks in order to provide Experi-metal some operating funds. Denise Ling said it was safe to deposit the funds and so Ms. Allison made a manual deposit of $78,914.20 at the Comerica branch.  Later Cassa informed Ms. Allison that all Experi-metal accounts were frozen.  When Ms. Allison inquired about the manual deposit Cassa said that there was nothing that could be done; that the accounts were frozen.  Experi-metal received two additional deposits from Chrysler after the phishing incident and Experi-metal never received those funds from Comerica and the funds were never returned to Chrysler.

The fraudsters had transferred money out of Ms. Allison's personal accounts into the corporate accounts and used her personal funds to make additional transfers and Ms. Allison told Cassa about it.   Cassa had no idea that Ms. Allison's personal bank accounts could be transferred into Experi-Metal's corporate accounts.  When the bank set up Ms. Allison's personal accounts on line, no one ever told her that money from personal accounts could be transferred into the corporate accounts.  Ms. Allison never authorized anyone to make a transfer from one of her personal accounts to an Experi-Metal account.

 Cassa later informed Ms. Allison that the fraudsters had tried to transfer money from her kids' accounts (Skylar, etc.) but they had been rejected because they tried to move more money than was in the accounts.   Cassa could not explain why the same thing did not happen with the

zero balance account.  $203,000 of Ms. Allison's personal funds were transferred out of her accounts and into Experi-Metal's account.

Comerica breached its written agreements with Experi-Metal in a number of ways.  First, Comerica accepted wire transfer orders despite the fact that the only written agreements in Comerica's possession verified that the only authorized wire transfer initiators at the time were Valiena Allison and Gerald King.  There were no written agreements that authorized Keith Maslowski to initiate wire transfers after 11/1/07.  They accepted book transfers of funds from a zero account balance for which no funds were available, contrary to the written agreements between the parties and contrary to the policies that were followed throughout the relationship by Comerica.  Experi-Metal was never allowed to do on-line book transfers from one account to another if the account from which the transfer was being made had insufficient funds.  Comerica always rejected those transfers.  Comerica accepted fraudulent wire transfers despite the fact that agreements with Experi-metal limited the amount of wire transfers to the amount of the available balance in the account.  The account had no balance as of approximately 9:00 a.m. on that date or should have had no balance but for the fraudulent transfers from the zero balance account.

Defendant failed to confirm the authenticity of payment orders in amounts above $250,000 despite the written agreement to do that.

On January 21, 2009 Comerica was aware of a phishing attack commenced against it via emails to its customers.  Comerica did not alert its customers or take action to protect its customers' accounts in the event of a successful attack.  On January 22, 2009 Comerica did not have fraud scoring or fraud screening in place as recommended by the FFIEC.  At 8:43 am that day Comerica did not allow a $10,000 transfer from Skylar's account, a personal account, because funds were not available. From 8:43 to 8:45 am Comerica allowed 5 transfers from Ms.

9

Allison's personal accounts to the Experi-metal sweep account totaling $103,000.  At 8:45 am Comerica allowed a $50,000 transfer from the zero balance Experi-metal Employee Savings Account to the Experi-metal sweep account.  That transfer was the first of 9 separate transfers from the zero balance Employee Savings Account to the sweep account on January 22 totaling $5,000,000, all of which should have been disallowed because funds were not available.  At 9:05 am and thereafter, Comerica allowed wire transfers to leave the sweep account based on the fictitious balance created by the fictitious transfers from the employee Savings Account, when in reality there was no longer any balance in the sweep account.  Between 11:49 am and 11:59 am Comerica's EDM department of Treasury Management failed to disable the TM Connect Web, or kill the session, after being instructed to do so.  At 12:04 pm the Comerica wire room was instructed to stop all future wires.  The required action however, was not taken until 12:28 pm.  At 1:24 pm a wire for $49,300 was allowed to leave the sweep account despite the actual negative balance in the sweep account, the instruction to "kill the session," and the instruction to stop all future wires.

## II.   ARGUMENT

### Governing Law

Whether the risk of loss for an unauthorized wire transfer falls upon the bank or its customer is governed by Sections 440.4702 and 440.4703 of Michigan's Uniform Commercial Code – Funds Transfers, which are adopted from Sections 4A-202 and 4A-203 of the Uniform Commercial Code ("UCC"). Pursuant to MCL 440.4702, wire transfer orders are effective as orders of the customer, even though the customer did not authorize the payment orders, if: (1) the bank and customer agreed that the authenticity of payment orders would be verified pursuant to a security procedure; (2) the security procedure is commercially reasonable; and (3) the bank

proves that it accepted the orders in good faith and in compliance with the security procedure and any written agreement or instruction of the customer.  MCL 440.4702(2).

**The Court's Prior Holding**

In the Opinion and Order Denying Defendant's Motion for Summary Judgment, the Court found, "As noted earlier, there is a genuine issue of fact with regard to whether Maslowski was authorized to initiate wire transfer orders using Comerica's online service as of January 2009.  *See supra* at n.2.  For this reason, the Court finds a genuine issue of fact with respect to whether Comerica complied with the security procedure when it accepted the wire transfer orders initiated with Maslowski's user information on January 22.  The Court also finds a genuine issue of material fact with respect to whether Comerica acted in 'good faith.'"

**Keith Maslowski was not Authorized to Initiate Wire Transfer Orders**

Keith Maslowski was not authorized by Experi-metal to initiate wire transfer orders on January 22, 2009.  There were no written agreements between Experi-metal and Comerica in effect as of January 22, 2009, authorizing Maslowski to initiate wire transfer orders on behalf of Experi-metal.  Accordingly Comerica cannot show under MCLA 440.4702(2)(ii) that it accepted the payment orders in compliance with the security procedure and in compliance with any written agreement restricting acceptance of payment orders issued in the name of Experi-metal.  The written agreements between Experi-metal and Comerica only allowed Ms. Allison and Gerald King to issue payment orders as of January 22, 2009.  Comerica's acceptance of the wire transfer orders in fact violated its own agreement.  The Comerica Treasury Management Services Master Agreement – August 2002, provides in Section 3.c., "Prior to utilizing any Service, Customer shall furnish the Bank with documentation naming Customer's employees, agents and third part vendors hired by Customer to perform any of the duties required by Customer under

11

this Agreement and which names those who are authorized to act on behalf of Customer with respect to the Services."

Comment 1 to MCLA 440.4703 provides that if MCLA 440.4702(2) does not apply, then the question of whether Experi-metal is responsible for the wire transfer orders is determined by the law of agency.  *Grabowski v. Bank of Boston,* 997 F. Supp 111 (Mass. 1997) also provides in the absence of an agreement, a bank's liability turns on the law of agency.  Maslowski did not have real or apparent authority to initiate wire transfer orders because that authority had been specifically removed from him in 2007 and Comerica was involved in the documentation of that removal.  The Comerica Treasury Management Services Master Agreement – August 2002, quoted above, requires documentation naming Customer's employees, authorized to act on behalf of Customer.  Comerica cannot claim that Maslowski had authority where its own agreement required that such authorization be in writing.  In *Grabowski,* the court held that where bank can easily ascertain whether an agent is exceeding his authority on the face of the documents it will be liable for the unauthorized transaction.

**Comerica did not Accept the Wire Transfer Orders in Good Faith**

Comerica's liability in this case also turns on whether Comerica acted in "good faith." Article 4A of the UCC defines "good faith" as "honesty in fact ***and*** the observance of reasonable commercial standards of fair dealing."  MCL 440.4605(1)(f).

The same definition of "good faith" appears in other articles of the UCC. *See, e.g,* UCC. §§ 3-103 and 9-102.  Neither the Sixth Circuit nor Michigan courts have elaborated on the meaning of the phrase "the observance of reasonable commercial standards of fair dealing" in any reported decisions, although the Michigan Court of Appeals has addressed the issue in an

unreported decision, *Buckeye Retirement Co LLC LTD v Manakey Group LLC,* 2010 WL 3656031 (Mich App) a copy of which is attached.

The Third Circuit held that "good faith," as defined in the UCC, "has both a subjective prong, (1) 'honesty in fact' – and an objective prong, (2) observance of 'reasonable standards of fair dealing.'" *In re Jersey Tractor Trailer Training Inc*, 580 F3d 147, 156 (3d Cir 2009); *see also* UCC § 1-203, cmt. 20. The court also adopted the following two-part test established by the Maine Supreme Court for evaluating the second component: "First, whether the conduct . . . comported with industry or 'commercial' standards applicable to the transactions and, second, whether those standards were reasonable standards intended to result in fair dealing." *In re Jersey Tractor Trailer Training, Inc.*, 580 F3d at 157 (citing *Maine Family Fed Credit v Sun Life Assurance Co of Canada*, 727 A2d 335, 343 (Me 1999)).

In *Maine Family Fed Credit Union, supra,* a credit union accepted over $120,000 in insurance checks for deposit from a member and immediately made the funds available to the member. The member then withdrew all of the funds before the credit union received notice 6 days following the deposit that the insurance company placed a stop payment the checks. The credit union made the funds immediately available even though the checks which were drawn on an out of state bank and were of a large amount. As a result, approximately a third of the funds were lost. In urging the jury to find that the Credit Union had not acted in good faith, Defendants argued that the Credit Union's conduct did not comport with reasonable commercial standards of fair dealing when it made the funds immediately available on checks totaling over $120,000 drawn on an out-of-state bank without either: (1) further investigation to assure that the deposited checks would be paid by the bank upon which they were drawn, or (2) holding the instruments to allow any irregularities to come to light.

13

The Supreme Judicial Court of Maine admitted that the Credit Union could meet the subjective standard of good faith ("honesty in fact" or "pure heart and empty head" standard) because it took the instruments without notice of any possible dishonor, defect, fraud or illegally. *Id.* The court, however, upheld a jury verdict that the Credit Union did not meet the objective standard of good faith. According to the court, the objective standard requires the conduct of the holder to comport with industry or "commercial" standards applicable to the transaction and that those standards be reasonable standards intended to result in fair dealing. *Id.* The court held that the Credit Union's failure to place a hold on the uncollected funds for a reasonable period of time under the circumstances did not comport with the commercial standards that were reasonably structured to result in fair dealing. *Id.* The court noted that the objective "element of good faith requiring the holder to act according to reasonable commercial standards of fair dealing is actually a more narrow version of the "reasonable person" standard…" 727 A.2d 335, at 342. The court also noted, "Accordingly, the drafters limited the requirement of fair dealing to conduct that is reasonable in the commercial context of the transaction at issue. In other words, the holder must act in a way that is fair according to commercial standards that are themselves reasonable." 727 A.2d 335, at 343.

In analyzing the effect of these standards the court stated, "We recognize that the Legislature's addition of an objective standard of conduct in this area of law may well have the effect of slowing the 'wheels of commerce.'… Notwithstanding society's oftcited need for certainty and speed in commercial transactions, however, the Legislature necessarily must have concluded that the addition of the objective requirement to the definition of 'good faith' serves an important goal." 727 A.2d 335, at 344.

14

As noted in the unpublished opinion from the Michigan Court of Appeals mentioned above, *Buckeye Retirement Co LLC LTD v Manakey Group LLC,* 2010 WL 3656031 (Mich App), a copy of which is attached, neither the UCC nor Michigan courts have defined "honesty in fact" or "the observance of reasonable commercial standards of fair dealing."

The Court noted that, "MCL 440.3403, Comment 2 provides that an unauthorized signer's liability is 'limited to parties who take or pay the instrument in good faith; [however,] one who knows that the signature is unauthorized cannot recover from the signer on the instrument.' MCL 440.3103, Comment 4 provides in relevant part:

> "The definition [of good faith] requires not only honesty in fact but also 'observance of reasonable commercial standards of fair dealing.' Although fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction. Both fair dealing and ordinary care, which is defined in Section 3-103(a)(7), are to be judged in the light of reasonable commercial standards, but those standards in each case are directed to different aspects of commercial conduct."

*Id.*

Whether a party's conduct meets this "fairness" standard is ordinarily a question that must be resolved by the factfinder. *San Tan Irrigation Dist v Wells Fargo Bank,* 3 P3d 1113 (Az 2000); *The Bank/First Citizens Bank v Citizens & Assoc,* 82 SW3d 259, 263 (Tenn 2002).

## Laws or Regulations as Industry or Commercial Standards

Courts have relied on applicable laws and regulations to determine the industry or commercial standards that apply and that are intended to result in fair dealing. In *Maine Family Federal Credit Union,* the court held that the fact-finder may look at applicable regulations to determine reasonable commercial standards of fair dealing. In *Jersey Tractor Trailer Training Inc.* the court looked to the applicable section of the UCC for conducting a reasonable lien

15

search, and held, "Using revised U.C.C. Sec 9-506(c) as a guide, we hold that a commercially reasonable lien search is a 'search of the records of the [relevant state or county] filing office, under the debtor's correct name, using *the filing office's standard search logic*…'" 580 F.3d 147, at 158.  In *Gerber & Gerber v. Regions Bank*, 266 Ga.App. 8, 596 S.E.2d 174 (Ga Ct App 2004) the court cited case law as the source for the reasonable commercial standard of fair dealing applicable to a bank that accepted forged checks for deposit in the account of an employee of the plaintiff.  The court noted that since the bank was aware of the plaintiff's normal banking practices that the bank was on heightened notice of the regularity of the endorsements on the checks presented for deposit by the plaintiff's employee.

In *Buckeye Retirement* the court determined that it was industry standard to perform due diligence on the existence of a corporation before making a loan.  The court held that the failure to perform due diligence was not reasonable commercial practice and therefore the plaintiff had not acted in good faith.

In *Brasher's Cascade Auto Auction v. Valley Auto Sales and Leasing*, 119 Cal. App. 4th 1038, 15 Cal. Rptr. 3d 70 (2004), the court looked to applicable statutes on the transfer of vehicle titles in an effort to determine reasonable commercial standards intended to result in fair dealing. The court ultimately determined that the relevant commercial standards should be established by expert testimony.

In *Buckeye Check Cashing, Inc. v. Camp*, 159 Ohio App 3d 784, 825 NE 2d 644 (Ohio Ct App 2005), the court was determining the reasonable commercial standards applicable to a check cashing business that had honored a post-dated check on which payment was stopped.  The court noted that the check cashing business is an unregulated business.  The court held that the plaintiff had to act in a responsible manner and that the nature of certain instruments renders it necessary

16

to take minimal steps to protect its interests.  As the court stated concerning the plaintiff in *Buckeye Check Cashing,* "Without taking any steps to discover whether the postdated check issued by Sheth was valid, Buckeye failed to act in a commercially reasonable manner and therefore was not a holder in due course." 825 NE2d 644, at 647.  Similarly, the Defendant in the case at bar failed to take any steps to discover if the wires initiated on EMI's account were fraudulent. The nature of online wire transfer initiation in this time of phishing and other cyber attacks on banks requires banks to take minimal steps to protect their interests as described in the Federal Financial Institution Examination Counsel guidelines.

### Governmental Guidelines as Industry Standards

In other areas of the law courts have looked to governmental standards or guidelines to determine industry standards.  In *Stone v. United Engineering, A Division of Wean, Incorporated*, 475 SE2d 439 (W.Va. 1996), the court, in a personal injury case based on a negligent design claim, noted that the safety standards do not have the force of law and are intended as recommendation, not requirements.  However, the court noted that courts are increasingly appreciative of the value of national safety codes and other guidelines issued by governmental and voluntary associations to assist the trier of fact in applying the standard of care.  The court held that evidence of safety standards may be relevant and admissible even though the standards have not been imposed by statute or promulgated by a regulatory body and do not have the force of law.  In another negligence case, *Elledge v. Richland/Lexington School District Five*, 534 SE2d 289(Ct App SC 2000), the court held that safety standards promulgated by government or industry organizations in particular are relevant to the standard of care.

The Michigan Supreme Court has approved the admissibility of governmental standards for the purpose determining the standard of care.  The Michigan court in reaching that result in

17

*Owens v. Allis-Chalmers Corporation*, 414 Mich 413 (1982), cited the statement of Judge Learned Hand to the effect that a calling may never set its own tests, however persuasive may be its usages (*The T J Hooper*, 60 F2d 740 (CA 2, 1932)).

**The Federal Financial Institution Examination Council Guidelines are the Industry Standard Applicable to Comerica**

The industry standards that apply to the bank in this case are established by the Federal Financial Institution Examination Council ("FFIEC") which prescribes "uniform principles and standards for the federal examination of financial institutions . . . [t]he Council's actions shall be designed to promote consistency in such examination and to insure progressive and vigilant supervision. 12 USC 3301. Also, the Gramm-Leach-Bliley Act of 1999 ("GLB"), 15 USC 6821, *et. seq.*, requires the Federal banking agencies to prescribe revisions to regulations and guidelines as may be necessary to ensure that financial institutions have policies, procedures and controls in place to deter and detect activities proscribed under 15 USC 6825.  The FFIEC has promulgated its Information Technology Examination Handbook (the "FFIEC Handbook") which includes E-Banking and Information Security booklets.  Pursuant to the guidelines as implemented by the FFIEC Handbook, Comerica should understand that no single control or security device can adequately protect a system connected to a public network.  Moreover, Comerica should have mechanisms in place to reduce the risk of undetected system intrusions.  The FFIEC Handbook established that a defense in depth is required; a single system is not sufficient.

**Comerica Did Not Meet Industry Standards**

Experi-metal's expert witness, Lance James, in his Report opines that Comerica did not meet industry standards because Comerica did not have monitoring systems in place to detect unusual activity in Experi-metal's accounts and Comerica did not address a known weakness to

man-in-the-middle attacks.  In Mr. James' opinion, almost all financial institutions have adopted the industry standards and implemented monitoring systems dubbed "fraud scoring" or "fraud screening."   Generally, this process is established by using readily available software which indexes historic transaction patterns and then compares those patterns against current activity through monitoring of current activity.  At a certain threshold, the system alerts the bank to the unusual activity and the bank would freeze the activity to stop the suspicious wire transfers.

In the opinion of Mr. James, if Comerica had complied with good faith and industry standards, Comerica would have quickly detected the fraudulent and suspicious activity within the first few transactions that were attempted by the fraudster.  This is especially true since on January 21, 2009, Comerica had advance notice of an on-going phishing attack.  Mr. James also opined that Comerica's actions in accepting the wire transfer orders based on the use of Maslowski's user information by the fraudster not only failed to comply with the agreements between the parties but also failed to comport with industry and commercial standards of the banking industry.

Mr. James also opined that industry standards have developed whereby banks quickly notify their customers of the imminent threat of known phishing emails and potential phishing attacks directed to the banks' customers.  Comerica failed to follow the industry standard or its own standard in January, 2009 and no warning was sent to Comerica's customers.  In Mr. James' opinion, banks following industry standards would not permit the transfer of non-existent funds. Comerica failed to meet industry standards by allowing the transfer of non-existent funds.  If Comerica had met industry standards the wire transfers would have stopped.  In the opinion of Mr. James, Comerica also failed to meet industry standards in its various actions after it was notified of the fraudulent wires by another bank.

**The Court Should Consider the Fairness of Comerica's Actions**

Case law is clear that in determining whether or not Comerica acted in conformity with reasonable commercial standards of fair dealing, the factfinder should consider the fairness of Comerica's actions, rather than any negligence on its part.  See *Agriliance, LLC v Farmpro Servs.,* 328 F Supp 2d 958, 970 (SD Iowa 2003)("whether reasonable commercial standards of fair dealing were observed . . . is ultimately a question of whether a reasonable lender (Farmpro) and reasonable bank (Central Bank) would have had reason to know of the potential competing claim . . . that they should have inquired about how the check was funded before accepting it."); *San Tan Irrigation Dist v Wells Fargo Bank,* 3 P3d 1113, 1116 (Az App 2000)(holding it unnecessary to decide whether the bank acted carelessly because the fair dealing prong of the good faith definition is concerned with the fairness of conduct rather than the care with which an act is performed): *Wachovia Bank NA v Federal Reserve Bank of Richmond*, 338 F3d 318, 323 (4th Cir 2003)("to determine whether Wachovia acted in conformity with reasonable commercial standards of fair dealing, we consider the fairness of Wachovia's actions, rather than any negligence on its part."); *Gerber & Gerber PC v Regions Bank*, 596 SE2d 174, 178 (Ga 2004)(stating that reasonable commercial standards of fair dealing are different from reasonable commercial standards of due care and holding that it was a question of fact whether the bank violated the reasonable commercial standards of fair dealing when it violated known commercial banking practices).

In *Trust Co Bank v Henderson,* 373 SE2d 738 (1988), the Georgia Supreme Court held that a bank did not comply with reasonable commercial standards of due care when it accepted checks payable to a firm, which were endorsed in blank by a firm employee and deposited in her personal account at the same bank, "where the established practice for the negotiation of checks

payable to this account was through the use of a restrictive endorsement stamp." *Id.*  The Court noted that this irregularity should have caused the bank to inquire as to the propriety of the endorsements when the checks being deposited by the firm employee into his personal account were payable to the firm and had been endorsed in blank.  *Id*

**Conclusion**

Based on the facts and the case law above, the Court must determine that Keith Maslowski was not authorized to initiate wire transfer orders as of January 22, 2009.  In addition, Comerica did not comply with security procedure and its written agreements when it accepted wire transfers orders from someone without authority to initiate wire transfers.

The Court must also determine that Comerica's actions violated the reasonable commercial standards of fair dealing relative to the following:  (1) allowing 47 fraudulent wire transfers to be initiated from a computer that had not initiated wire transfers before and was not located in the United States, with unusual destinations to which the transfers were directed (*i.e.* Moscow, Estonia, and China), particularly with respect to a customer which had made only two wire transfers in the prior two years, with those transfers being made in 2007; and (2) allowing an additional 46 fraudulent wire transfers after activity in Experi-Metal's account was detected, Comerica having contacted Experi-Metal, and Experi-Metal having instructed Comerica not to honor any further transfers.

The court must analyze whether Comerica's actions were fair, not negligent. Comerica's actions do not meet the objective prong of the definition of good faith, observance of 'reasonable standards of fair dealing.'"  Comerica's actions cannot be deemed fair when those actions do not comport with industry standards.  As noted by Plaintiff's expert, Lance James, a simple fraud scoring system or fraud monitoring program to monitor the accounts for unusual activity, would

have stopped the fraud very quickly and been in line with reasonable commercial standards of good faith and fair dealing.   Likewise, sending those unusual wire transfers to unusual destinations such as Moscow, Estonia and China, does not demonstrate good faith and fairness particularly in light of Plaintiff's limited prior use of wire transfers.

Respectfully submitted,

DRIGGERS, SCHULTZ & HERBST, P.C.

By: s/Richard B. Tomlinson
  Richard B. Tomlinson (P27604)
  Daniel R. Boynton (P30359)
  Joseph W. Thomas (P33226)
  Attorneys for Plaintiff
  2600 W. Big Beaver Road, Suite 550
  Troy, MI 48084
  Telephone:  248.649.6000
  Fax:  248.649.6442

Dated: January 19, 2011              rtomlinson@driggersschultz.com